*ı 9 ℒ 6*

SNYDER *vs.* ANDREWS.

Where the writer of a letter, containing libellous matter, reads the same aloud to a stranger, it is a publication.

When a charge, in a written publication, is equivocal, the construction of it is a question for the jury.

Where the writing complained of as libellous, is plain and unambiguous, the question, in a civil action, whether it be a libel or not, is a question of law. HAND, J. dissented.

In a civil action for a libel, or slander, the truth of the charge is a justification; but it can not be given in evidence unless it is pleaded, or notice thereof is given with the general issue.

Under the general issue, in an action for libel or verbal slander, any matter may be given in evidence in mitigation, which does not tend to a justification, and which falls short of it.

The cases on the law of libel, as to the rights and duties of the court and jury respectively, stated and explained.

THIS was an action on the case for a libel. The defendant pleaded the general issue, and gave notice of special matter. The alleged libel was contained in a letter written by the defendant and addressed to the plaintiff, and sent to him by mail, after having been read to two or three persons by the defendant. The most material part of the letter was as follows: "Sir: It is now discovered who had received the balance of account from George W. Cole. I sued him and he brought forward a receipt in which my name was used; but every word, line and letter was in your hand-writing. Now here is a deliberate attempt to charge me with moneys which I never received; and my name signed to a receipt which I never saw until it was presented in court, and without any authority from me. It is not my purpose to call hard names. The statute fixes the name and punishment of the offence. It is fortunate for you that some of your good friends here are not the parties offended against, or they would most likely put you to a deal of trouble. It is surprising that any person should be guilty of such an act,

when detection was inevitable.   On the opposite half sheet is my account against Gazlay & Snyder and yourself.   If the amount is remitted to me immediately, by mail, the matter will rest, so far as I am concerned, unless called on to testify, in which case I have no alternative.   You can have no possible excuse for the course you have pursued in this matter.   You could not have forgotten the payment of the money to you by Cole; and the only hope of impunity you must have drawn from the supposition that Cole had lost the receipt," &c.

The notice annexed to the plea stated, in substance, that previous to the writing of the alleged libel the plaintiff and one A. H. Gazlay had been copartners in the saddle and harness making business; that on a dissolution of the copartnership they placed their accounts, &c. in the hands of the defendant for settlement and collection ; that among them was one against G. W. Cole, who paid thereon $10 to the defendant, leaving a balance of from five to eight dollars unpaid ; that on rendering to the plaintiff and Gazlay an account of the moneys collected by him as their attorney, it appeared that there was due from them to the defendant, for collection fees, the sum of $4,37; where-upon it was agreed between the parties that the defendant should retain the account against Cole, and collect the same, and from the proceeds pay himself the balance due him ; that Cole, on being called upon to pay the balance of his account, informed the defendant that he had paid the same to the plain-tiff; that the defendant communicated that fact to Gazlay, and Gazlay told the plaintiff of it, who denied all knowledge of such payment; that thereupon, with Gazlay's assent, a suit was brought against Cole, to recover the balance of the account ; that on the return day of the process, Cole produced a bill in favor of Gazlay & Snyder against him, amounting, after de-ducting a credit of $10, to $7,89.   This bill was receipted, at the bottom thereof, as follows: " Rec'd payment in full of the above account.   By J. M. Andrews.   GAZLAY & SNYDER." That such receipt was in the hand-writing of the plaintiff; that the defendant never received the said sum of $7,89, or any part thereof, directly or indirectly from Cole, and never signed such

Snyder *v.* Andrews.

receipt nor authorized any person to do it for him; and that the plaintiff had admitted that he executed and delivered the receipt. And that after the suit against Cole had been discontinued in consequence of the production of such receipt, the defendant, at the request, and with the knowledge, of Gazlay, wrote a letter to the plaintiff, informing him of the result of the suit, and of the causes which produced it; that before the letter was sent Gazlay called upon the defendant several times for the purpose of seeing and conversing with him in relation to said business; and that whatever knowledge he obtained in relation to such letter, or its contents, was a confidential and privileged communication as between attorney and client; that such letter was not shown or read to any one else, but was strictly a private letter, and as such was sent to the plaintiff; which letter was the same set out in the plaintiff's declaration, &c.

The cause was tried at the Saratoga circuit, in November, 1847, before Justice PAIGE. On the trial the defendant admitted that he wrote the letter containing the alleged libel, sealed the same, and put it into the post office at Saratoga Springs, directed to the plaintiff, at his residence. The plaintiff proved by John R. Brown, that the letter was read to the witness by the defendant, at his office, in the presence of a young man who was a clerk of the defendant. The defendant's counsel then moved for a nonsuit, on the ground that a publication of the libel had not been proved. The judge denied the motion. The defendant then offered evidence in support of the defence set forth in his notice. The plaintiff's counsel objected to the introduction of such proof, unless the defendant elected whether he would offer it in justification, or in mitigation of damages. The judge decided that the letter imported a charge of forgery, and that the facts stated in the notice did not make out a justification of such a charge; but that the evidence was admissible in mitigation of damages. The defendant excepted to both branches of this decision, separately. His counsel then offered to prove such facts in mitigation of damages, and the court admitted the evidence for that purpose only. The judge, in charging the jury, told them that the reading of the letter

---

Snyder *v.* Andrews.

---

by the defendant, in Brown's hearing, amounted to a publication of the libel. That the letter imported a charge of forgery against the plaintiff; and that they could only consider the facts proved by the defendant, in mitigation of damages. The jury found a verdict for the plaintiff, of $250. And the defendant, upon a bill of exceptions, moved for a new trial.

*A. Bockes*, for the plaintiff.

*D. Wright*, for the defendant.

WILLARD, J. There are only three points raised by this bill of exceptions, viz. First, whether the reading of a letter, alleged to be libellous, to a third person, is a publication. Second, whether the judge was warranted in charging the jury that the letter in this case imported a charge of forgery. And third, whether the facts proved, on the part of the defendant, were admissible in *bar* of the action, or only in *mitigation* of damages.

*First.* The fact, that the defendant read the letter to a stranger, before it was sent to the plaintiff, was not questioned on the trial, and is assumed to be true, by the form of the objection; but it is insisted, that such reading did not amount to a publication of the libel. No man incurs any civil responsibility by what he thinks, or even writes, unless he divulges his thoughts, to the temporal prejudice of another. Hence, a sealed letter, containing libellous matter, if communicated to no one but to the party libelled, is not the foundation for a *civil* action, although it may be of an indictment. (*Lyle* v. *Clason*, 1 *Caines*, 581. *Hodges* v. *The State*, 5 *Humphrey*, 112. 1 *Wm. Saund.* 132, n. 2. *Philips* v. *Jansen*, 2 *Esp. C.* 626. 2 *Starkie on Slander, Wend. ed.* 14.) But where the defendant, knowing that letters addressed to the plaintiff were usually opened by, and read by his clerk, wrote a libellous letter, and directed it to the plaintiff, and his clerk received and read it, it was held there was a sufficient publication to support the action. (*Delacroix* v. *Thevenot,* 2 *Stark. Cases,* 474.) And in *Schenck* v. *Schenck,* (1 *Spencer,* 208,) a sealed letter addressed and

Snyder *v.* Andrews.

delivered to the wife, containing a libel on her husband, was held a publication sufficient to enable the latter to sustain an action. Reading or singing the contents of a libel in the presence of others, have been adjudged a publication.. (2 *Starkie on Slander*, 16. 5 *Rep.* 125.   9 *Id.* 59, *b.*   1 *Saund.* 132, *n.* 2.)   The reading of the letter in question, by the defendant, in the presence of Brown, was a sufficient publication to sustain this action.

*Second.* The second objection is that the learned judge charged the jury that the letter imported a charge of forgery against the plaintiff. This involves two propositions; first, as to the *fact* whether such charge was made in the letter; and secondly, whether the court or the jury, in a civil action, are to decide as to whether the publication be a libel or not. Although the letter does not use the term forgery, no one can doubt that the writer intended to communicate the imputation of that crime. It charges the plaintiff with having subscribed the defendant's name to a receipt for money, which the defendant never received; and with having so subscribed it without authority. "It is not my purpose," says the letter, "to call hard names. The statute fixes the name and punishment." In other places he charges that it was done to defraud him, the defendant, out of the money. If the letter had been equivocal in its terms, it would have been the duty of the judge, to submit the construction of it to the jury. (*See Van Vechten v. Hopkins,* 5 *John. Rep.* 211; *Goodrich* v. *Wolcot,* 3 *Cowen,* 231, *affirmed in error,* 5 *Id,* 714; *Woolworth* v. *Meadows,* 5 *East,* 463; *Peake* v. *Oldham, Cowper,* 278; *Dexter* v. *Taber,* 12 *John. Rep.* 239; *Van Rensselaer* v. *Dole,* 1 *John. Cas.* 279; *per Woodworth, J. in McKinley* v. *Robb,* 20 *John. Rep.* 356; *Demarest* v. *Haring,* 6 *Cowen,* 76; *Ex parte Bailey,* 2 *Id.* 479; *Mott* v. *Comstock,* 7 *Id.* 654; *Bullock* v. *Coon,* 9 *Id.* 30; *Powers* v. *Price,* 12 *Wend.* 500; 4 *Watts,* 392; 4 *Wend.* 320; 17 *Id.* 428, 429, *per Bronson, J.*)

It does not, however, appear that the defendant's counsel asked to go to the jury with any question connected with the meaning or construction of the letter; or that he required the judge to submit to them any such question. Assuming, then,

Snyder *v.* Andrews.

that the letter contains clear and unequivocal libellous matter, the further question arising under this point, is, whether it was error in the learned judge so to tell the jury; or whether he was bound to submit it to them as matter of fact, to find whether it was a libel or not. In other words, whether, in a civil action, the question of libel or no libel, is a question of law or of fact. The question is of sufficient importance to justify an examination of it upon principle and authority.

If the writing complained of is couched in clear and unambiguous terms, so that no circumstances are wanted to make it clearer than it is of itself, the question whether it be a libel or not is necessarily one of law and not of fact. Such seems to be the result of the opinion of Lord Chief Justice De Grey in the house of lords, in the case of *The King* v. *Horne*, (*Cowper*, 672,) cited with approbation by Van Ness, J. in *Van Vechten* v. *Hopkins*, (5 *John*. 221.) To the same effect are *Rex* v. *Burdett*, (4 *Barn. & Cress*. 95,) decided in 1820, *Haire* v. *Wilson*, (9 *Id*. 643,) decided in 1829, and *Fisher* v. *Clement*, (10 *Id*. 472,) decided in 1830. This doctrine was in substance conceded by General Hamilton in his celebrated argument in *The People* v. *Croswell*, (3 *John. Ch*. 361, 2,) in his 13th proposition : "That in the general distribution of powers, in any system of jurisprudence, the cognizance of law belongs to the court, of fact to the jury. That as often as they are not blended, the power of the court is absolute and exclusive. That in *civil cases* it is always so, and may be rightfully so exerted." And it was expressly asserted by Kent, J. in delivering his opinion in the same case. (*Id*. 376.) " The opinion" of the judge in criminal cases, he observes, " will generally receive its due weight and effect, and in *civil cases* it can and always *ought* to be ultimately enforced by the power of setting aside the verdict."

The English cases and elementary writers, until within a few years, spoke a uniform language on this subject; holding that jurors are not the judges of the law, in civil actions for a libel, notwithstanding the statute 32 G. 3, ch. 60, commonly called Mr. Fox's act. (*Levi* v. *Milne*, 4 *Bing*. 195, *decided in* 1827. *Starkie on Slander, Wend. ed.* 275, 6, *and note. Rex* v. *Bur-*

Snyder *v.* Andrews.

*dett,* 4 *B. & C.* 95, *supra.*)   And in the last mentioned case, they held that the jury, even in a criminal case, was bound to receive the law from the court on the question whether the publication was a libel, or not.   The cases in which a defence has been predicated upon the *occasion of the publication,* as showing an honest and fair intent in the defendant, and requiring, to support the action, evidence of *express malice,* are not a departure from previous adjudications, nor in conflict with this rule. *Fairman* v. *Ives,* (5 *Barn. & Ald.* 642,) was of this description.

The case of *Parmeter* v. *Coupland,* in the court of exchequer in 1840, (6 *Meeson & Welsby,* 105,) is supposed to be at variance with the prior decisions in England ; and as it is the leading case of the *new doctrine,* and the one on which the subsequent case of *Baylies* v. *Lawrence,* (11 *Ad. & Ellis,* 920,) is based, it will be well to examine it more in detail than its importance would otherwise merit.   It was an action for a series of libels, published of the plaintiff, the late mayor of the borough of Winchester, in the Hampshire Advertiser newspaper, between the 17th Nov. 1838, and 2d March, 1839, imputing to him partial and corrupt conduct, and ignorance of his duties, as mayor and justice of the peace for the borough.   At the trial, under the plea of not guilty, before Coleridge, J. the learned judge, in the course of his summing up, stated to the jury that there was a difference with regard to censures on public and on private persons ; that the character of persons acting in a public capacity was to a certain extent public property, and their conduct might be more freely commented on than that of other persons ; and having told the jury what, in point of law, constituted a libel, he left it to them to say, whether the publication in question was calculated to be injurious to the character of the plaintiff. The jury found a verdict for the defendants.   On a motion for a new trial, the plaintiff's counsel contended that the learned judge misdirected the jury, in not stating to them, as matter of law, that the publications in question amounted to libels.   The counsel contended that the same principle should apply to written as to oral slander.   That the words here complained of were clearly actionable if spoken ; and the judge would, in

such case, have been bound to tell the jury that if they were used in their ordinary sense, the plaintiff was entitled to recover. After further remarks of the counsel, Parke, B. interrupting the counsel, observed that the practice used to be as the counsel said, before Mr. Fox's act, 32 G. 3, ch. 60. " That act," the counsel replied, " is expressly confined to *criminal* cases." [Parke, B. " It is true ; but it has been the constant practice, in recent times, for the judge to define what is a libel, and then to leave it to the jury, first, whether the writing complained of was published by the defendant ; secondly, whether it fell within the definition of the offence."] Lord Mansfield distinctly laid it down, in the case of *Rex* v. *Dean of St. Asaph,* as a general rule, applicable to all cases, when by the form of the pleading the questions of law and fact can be severed, that the jury have no jurisdiction to decide upon the law. When indeed the words may be controlled by the context, or are capable of more than one meaning, the question must be left to the jury ; but here there is nothing whatever to throw ambiguity upon the mean- ing of these paragraphs. [Parke, B. " In criminal cases the judge is to define the crime, and the jury are to find whether the party has committed that offence. Mr. Fox's act made it the same in cases of libels, the practice having been otherwise before."] In the next place the counsel contended that it was a misdirection to state to the jury, that there was a distinction as to libels on a person in a public capacity. No man has a right to impute to another, whether filling a public capacity or not, injustice or corruption. Parke, B. " The verdict is unques- tionably wrong, and there ought to be a new trial, but on the ground of its being a wrong verdict only. I think there was no misdirection on the part of the learned judge. One of the grounds upon which this rule was obtained was, that the learn- ed judge ought to have told the jury that the terms of these papers were libellous, and not to have left that as a question of fact for them to determine. But it has been the course for a long time for a judge, in cases of libel, as in other cases of a criminal nature, first to give a legal definition of the offence, and then to leave it to the jury to say whether the facts necessary

Snyder *v.* Andrews.

to constitute that offence, are proved to their satisfaction; and that whether the libel is the subject of a criminal prosecution or civil action. A publication without justification or lawful excuse, which is calculated to injure the reputation of another, by exposing him to hatred, contempt or ridicule, is a libel. Whether the particular publication, the subject of inquiry, is of that character, and would be likely to produce that effect, is a question upon which a jury is to exercise their judgment, and pronounce their opinion as a question of fact. The judge, as a matter of advice to them in deciding that question, might have given his own opinion, as to the nature of the publication, but was not bound to do so, as matter of law. Mr. Fox's libel bill was a declaratory act, and put prosecutions for libel on the same footing as other criminal cases. I also think that there was no misdirection in the other part of the learned judge's summing up to which an objection was raised. There is a difference between publications relating to public and private individuals. Every subject has a right to comment on those acts of public men which concern him as a subject of the realm, if he do not make his commentary a cloak for malice and slander; but any imputation of wicked or corrupt motives is unquestionably libellous; and such appears to be the nature of the publication here. I do not find that the learned judge stated otherwise; we cannot therefore grant a new trial, as for a misdirection."

The other judges concurred. Alderson, B. remarked " that it was the duty of the judge to define what is a libel, and to refer to the jury the consideration of the particular publication, whether falling within that definition or not. I think if he were to take it upon himself to say that it was a libel, he would be wrong in doing so." Rule absolute for new trial, on payment of costs.

We have given a full abstract of this case because it has gone further than any other at bar, in favor of submitting to the jury the question of libel or no libel, in a civil action, when there is nothing ambiguous or doubtful in the publication. It is admitted to be a practice that has grown up, in recent times, and that it owes its origin to a construction given to the libel bill of Mr.

Fox, (32 G. 3, ch. 60,) which will be more fully noticed hereafter. With the particular construction of that act, which the courts in Great Britain may, from time to time adopt, we have little to do. We can not but remark, in reference to the case of *Parmeter* v. *Coupland*, (*supra*,) how readily one anomaly in practice leads to another. The judges refuse to instruct the jury, whether a publication, clear and unambiguous in its terms, and confessedly a libel, falls within the definition of a libel, but leave it for the jury to decide, who find for the defendants; and then the court set aside the verdict as against law. If the question was properly for the jury, and fairly submitted, their decision should, on principle, be conclusive. If the court have the power to set aside the verdict, when for the defendant, because the jury have found against law, it seems to us the better remedy is to pursue the old practice of declaring the law before verdict, as in other civil cases, and thus preserve consistency and uniformity in the system.

The case of *Parmeter* v. *Coupland*, in the exchequer, was followed, in the same year, by that of *Baylies* v. *Lawrence* in the queen's bench. (11 *Ad. & Ellis*, 920.) The latter was an action for a libel alleged to be contained in a letter from the defendant to the landlord of the plaintiff, complaining of the conduct of the latter, in relation to the destruction of game. The letter was given in evidence, and with respect to it, the Lord Chief Baron, (Abinger,) before whom the cause was tried, said to the jury: " I own I find a difficulty in saying whether it is a libel or not. Gentlemen, can you assist me ?" His lordship gave no other direction as to that issue. The plaintiff obtained a rule for a new trial, on the ground of misdirection. In showing cause against the rule, the defendant's counsel contended that the judge is not bound to give his opinion whether the publication be libellous or not. They relied on the libel act, (32 G. 3, ch. 60,) the second section of which enacts " that the court or judge, *according to their or his discretion*, shall give their or his opinion and directions to the jury." And they also relied upon the case of *Parmeter* v. *Coupland*, (*supra*.) The counsel on the other side insisted that the case of *Haire* v. *Wil-*

*son*, (9 *B. & Cress.* 643,) and *Fisher* v. *Clement*, (10 *Id.* 472,)
established a different doctrine from that advanced by Lord
Abinger, and that it was at least his duty to give a definition
of a libel.   Lord Denman, Ch. J.   " This rule was granted for
the purpose of settling the practice.   Two cases have been
cited, in which this court is supposed to have held that the judge
must tell the jury whether the publication be a libel or not.
I think that when these cases are properly considered, they do
not go so far.   They show that a judge must not leave the fact
of the defendant's intention, as a question for the jury, except
so far as the intention may be shown by the tendency of the
publication itself.   A man way wilfully publish a mischievous
libel without intending to injure the party, yet may be respon-
sible.   He may, indeed, in effect do him no harm, by the publi-
cation, for it may be that blame from some quarters is more
valuable than praise.   Yet he must answer for such a publication.
I have always followed the practice adopted in this case by Lord
Abinger, leaving the jury to say whether under all the circum-
stances, the publication amounts to a libel.   That practice is
analogous to the enactments of 32 Geo. 3, ch. 60.   The statute
indeed is applicable only to criminal cases; but it was a declar-
atory act; and the importance of declaring the law existed only
in criminal cases.   The act therefore furnishes clear evidence
that the judge is not, in civil cases, bound to state his opinion
whether the publication be libellous or not.   And this agrees
with the late case of *Parmeter* v. *Coupland*, (6 *M. & W.* 105.)
There is indeed one case in which a pure question of law arises.
If the judge and jury think the publication libellous, still, if on
the record it appears not to be so, judgment must be arrested."

The other judges concurred with the lord chief justice.
Patterson, J. remarked, that " upon examining the cases, cited
in support of the rule, it appears from them, only, that it is mis-
direction to leave to the jury the intent as a general question of
fact, because the defendant must be taken to intend that which
is the obvious consequence of his publication.   A judge is of
course not precluded from giving his opinion, but he is not
bound to do so."   Rule discharged.

With reference to the case of *Baylis* v. *Lawrence*, (*supra*,) it may be remarked, that the alleged libel was so vague in its terms that it was a proper question for the jury under any previous state of the law of libel. Had the court decided no more, than that in that particular case, Lord Abinger was right in submitting it to the jury, the decision could not have been questioned on principle or authority. But it is obvious that the court meant to place the decision upon the construction of the ' libel act. (32 *G.* 3, *ch.* 60, § 2.) The clause on which they lay stress, viz. " that the court or judge, *according to their or his discretion*, shall give their or his opinion and directions to the jury," is not contained in the libel act of this state of 1805, (2 *R. L.* 553,) nor in the constitution of 1821 ; (*see Art.* 7, § 8 ;) nor in the present constitution. (*See Art.* 1, § 8.)

The cases of *Parmeter* v. *Coupland* and *Baylis* v. *Lawrence* were followed by that of *Hearne* v. *Stowell*, in the queen's bench in 1841. (4 *P. & D.* 697.) The latter is the converse of *Parmeter* v. *Coupland*. In *Parmeter* v. *Coupland* the jury found for the defendant, and the court set aside their verdict as against law. In *Hearne* v. *Stowell*, the learned judge, after disposing of other matters, instructed the jury, if they thought the matter of the publication to be libellous, to find a verdict for the plaintiff," and the jury found for the plaintiff. A motion was made by the defendant in arrest of judgment and for a new trial, mainly on the ground that "the learned judge ought to have told the jury that the declaration did not charge any thing libellous."

The counsel for the plaintiff relied mainly upon the construction of the libel act, as declared in *Parmeter* v. *Coupland* and *Baylis* v. *Lawrence*, and insisted that whether a particular publication be libellous is a question of fact for the jury, and they having found it libellous, under a proper direction from the court, the verdict could not be disturbed.

Lord Denman, Ch. J. on this branch of the argument remarks, "we were desirous of considering whether the defendant was entitled to a new trial because the learned judge ought to have told the jury to acquit on the plea of not guilty."

Snyder *v.* Andrews.

If the learned judge had been pointedly required to do this, he might have declared his opinion on the question of law now discussed, or he might have reserved the point for the court. If he had told the jury that the paper proved was a libel, when the court was of opinion that it was not, we should have been bound to set aside a verdict so obtained, for misdirection. But the defendant, on the trial, took a different course, and sought an acquittal from the occasion of reading this libel, the bona fides of his strictures on the Catholic priesthood, and indeed, from insinuating that they were founded in fact. Nor did the learned counsel object to the reception of evidence, which it is now truly observed, applied to no fact put in issue. We do not think it open for him to move for a new trial on this objection." The court, however, arrested the judgment, on the ground that the publication, as set forth in the declaration, was not a libel.

It thus has been seen that in England, it is not error for the judge, in a civil action for a libel, to give his opinion to the jury on the question whether the publication be a libel or not; but he is at liberty to do so or not at his discretion. It was the general understanding in this state, that the libel act of 1805, and the same provision incorporated into section 8 of article 7 of the constitution of 1821, applied only to a *criminal* proceeding for a libel, and did not affect the practice in *civil actions.* Hence, in the latter cases the jury were no more the judges of the law in an action for a libel, than in any other civil suit; and it was as much the duty of the judge to instruct the jury on the law in the one case as the other. A contrary suggestion was never advanced in our reports until the intimation of senators Root and Verplanck, in 1841, in the case of *Dilloway* v. *Turrell,* (26 *Wend.* 399, 402.) But the chancellor expressed his surprise at that construction of the constitution, and ventured to say that no lawyer had ever before supposed that the provision in question extended to civil suits for a libel, between party and party. He showed also that if a civil action was embraced under that clause of the constitution, instead of operating favorably to defendants, it would have a contrary tendency.

Snyder *v.* Andrews.

At common law, the truth has always been a defence to a civil action for a libel; but if this provision of the constitution was to be extended to civil suits, the truth would no longer be a defence unless the defendant could also show that the publication was from good motives and justifiable for ends. In the late convention, the committee on the rights and privileges of the citizens of this state, on the 30th of June, reported the 8th section of the 7th article of the constitution of 1821, so amended as to apply expressly to *civil actions,* thus making the jury the judges of the law and the fact in civil as well as criminal cases; and preventing the truth from being a defence in both, unless it was shown to be published from good motives, and for justifiable ends. (*Croswell's Rep. of Conv. p.* 153.) At a subsequent day, (*Id. p.* 813, 814, *and Atlas ed.* 1061,) the words *civil actions* were stricken out, and the section was adopted, extending in terms only to criminal prosecutions; and leaving it in other respects unaltered. (*See* 1 *article,* § 8 *of Constitution of* 1846.)

From this review of the cases, there can be no doubt that the learned judge did not encroach upon the prerogative of the jury, in charging that the letter in question was a libel.

*Third.* The remaining question is whether the facts proved under the notice were admissible in *bar* of the action, or only in *mitigation* of the damages.

No question is better settled than that in a civil action for a libel or verbal slander, the truth cannot be given in evidence as a defence, unless notice thereof is given with the general issue, or the matter is specially pleaded. The plea or notice of justification must be framed with the same degree of certainty and precision as are requisite in an indictment for the crime imputed. (*McPherson* v. *Daniels,* 10 *B. & C.* 249. 1 *Starkie on Sland.* 476. *Underwood* v. *Park,* 2 *Str.* 1200. *Bul. N. P.* 9. *Smith* v. *Richardson, Willes,* 20. 5 *B. & A.* 646. 2 *Phil. Ev.* 249. 2 *Stark. Ev.* 470, 471. 2 *Stark. on Sland.* 87.) The foregoing are English authorities, but the same doctrine has been held here, as far back as our reports extend, without a single exception. (*See* 13 *John.* 477; 14 *Id.* 233; *Root* v. *King,* 7 *Cowen,* 632; *Anthon's N. P.* 25, *n. e;* 8 *Wend.* 576; 19 *Id.* 487.) The

notice does not profess to be in bar of the action.   Every fact it
discloses was admissible under the general issue.   It has always
been competent, under that issue, to give any thing, in evidence
in mitigation, which does not tend to a justification, and which
falls short of it.   (*Gilman* v. *Lowell*, 8 *Wend.* 573.   *Purple*
v. *Horton*, 13 *Id.* 9.   *Cooper* v. *Barber*, 24 *Id.* 105, 108.)
Under the code, it seems, a different rule will prevail; and
matters of mitigation as well as of justification are put upon the
same footing, and must be set up in the defendant's answer.
(*Code of Procedure* §§ 142, 144.)   But this cause was com-
menced and tried before the code of procedure was enacted.

The facts proved under the notice were thus fairly submitted
by the learned judge to the jury.   The reason why they did not
exert a favorable influence on their minds, probably arose from
circumstances not disclosed in the bill of exceptions.   At any
rate, the court can not grant a new trial on a bill of exceptions
for an unwise exercise of the discretion of the jury as to the
amount of damages.

PAIGE, P. J. concurred.

HAND, J.   A witness stated that the plaintiff, who lived in
Clinton county, came to Saratoga six weeks after the letter was
written.   The defendant's counsel called upon the plaintiff's
counsel to state the object of this proof.   To which it was re-
plied that "in the declaration the plaintiff claimed special dam-
ages for being compelled, in consequence of the libel, to proceed
from Clinton county to Saratoga Springs; and he offered this
evidence in relation to that part of the declaration."   To this
evidence the defendant's counsel objected, but the court decided
that it was admissible for the purpose for which it was offered,
and the defendant excepted.

I am inclined to think this was error.   The inquiry was not
pursued, and the answer had been given before the objection
was taken.   But as soon as the defendant discovered the object
he made the objection, and the testimony was held to be ad-
missible, and of course was allowed to go to the jury.   That

the plaintiff saw fit to go to Saratoga to make inquiry in rela-
tion to the matter, was a circumstance having no legitimate
bearing upon the question of damages. It was altogether too
remote, and not the necessary consequence of the libel. But
there are other and more important questions in the case.

The court charged the jury that "the reading of the letter by
the defendant in Brown's hearing, as stated by Brown, amount-
ed to a publication of the libel." To this the defendant except-
ed. By this remark the court no doubt intended to say, that
if the jury believed the defendant read the letter to Brown, that
would be a publication. Whether this letter was read to Brown,
or whether any letter to the plaintiff was read to him, were
questions for the jury and not for the court; and I do not un-
derstand the judge to have intended to decide otherwise. Whe-
ther facts sufficient to constitute publication have been proved,
has always been considered a question for the jury. (*Cooper*
v. *Greeley,* 1 *Denio,* 361.)

But again; the judge charged the jury that "the letter im-
puted a charge of forgery against the plaintiff." To this the
defendant also excepted. This was tantamount to saying that
the instrument was a libel, and gave a construction to it, as a
matter of law. Perhaps the respective duties of the judge and
the jury, in libel cases, are not very clearly or well settled in
this state. The old rule in criminal prosecutions was, or at
least was often declared to be, that the jury had only to pass
upon the questions of publication and the truth of the innuen-
does. And yet in the celebrated case of the Seven Bishops, it
would seem the court submitted more than this to them.
(4 *St. Tr.* 304.) This rule prevailed until the act of 32 Geo. 3,
c. 60, which in criminal cases changed it, or perhaps only de-
clared it to be different. But that act, for a long period, was
held not to extend to civil cases, and in criminal cases was very
much restricted. The origin and history of this statute and our
"act concerning libels," passed April 6, 1805, are familiar to
every lawyer. (3 *Hallam's Eng.* 230. 5 *Campb. Lives of the
Chan.* 274, ch. 148. *The People* v. *Croswell,* 3 *John. Ca.* 337.)
The courts of this state, (as well as those of England,) treated

Snyder *v.* Andrews.

the statute as inapplicable to civil cases, in which the court were to declare whether the matter published amounted to a libel. (*Turrill* v. *Dolloway*, 17 *Wend.* 426. 2 *Starkie on Slander*, ch. 16. *King* v. *Burdett*, 4 *B. & Ald.* 95, 131. *Levi* v. *Milne*, 4 *Bing.* 195.) But in the court for the correction of errors, the case of *Turrill* v. *Dolloway* was reversed, on the ground, as I understand the case, that the jury had a right to decide in what sense the words were used. (*Dolloway* v. *Turrill*, 26 *Wend.* 383.) Some of the members of the court considered the statute to apply to civil suits. This decision was in 1841 ; and a short period before, the courts in England had taken similar ground. In *Baylis* v. *Lawrence*, (11 *Ad. & El.* 920,) the judge left the question to the jury, without giving any opinion, and the court held he was right. And Ld. Denman, C. J. said, "I have always followed the practice adopted in this case by Lord Abinger, leaving the jury to say whether, under all the circumstances, the publication amounts to a libel." And he thought the libel act of 1792 applicable only to criminal cases, but declaratory of the law in civil cases. And Littledale, J. said, that he knew " no distinction between the law in criminal cases and that in civil cases in this respect." Patterson and Williams, Js. thought the judge could give his opinion as in other cases of fact, and might have given the definition of a libel, but "must still have left it to the jury whether the particular case fell within the definition." Certainly, if it was a question of law for the court, the judge was bound to declare whether the article was libellous. In *Hunt* v. *Algar*, (10 *Bing.* 245,) *Parmeter* v. *Coupland*, (6 *M. & W.* 105,) *Fairman* v. *Ives*, (5 *B. & Ald.* 642,) *Fisher* v. *Clement*, (10 *B. & C.* 472,) *Hearne* v. *Stowell*, (12 *Ad. & E.* 719,) *Chalmer* v. *Payne*, (2 *Cr. M. & R.* 156,) a similar practice seems to have obtained. And in *Ex parte Bailey*, (2 *Cowen*, 482,) the court say, that where there is room for the least criticism upon the import of the words it is a proper question for the jury, whose decision is conclusive. (*And see Goodrich* v. *Wolcott*, 3 *Cowen*, 231.)

I do not say there are not cases in which the court may perhaps give a construction to the publication, as in the case of a

gross and unqualified charge of a crime ; but this paper I think should have been submitted to the jury. And upon the whole, I think the safer practice is, for the judge to define what is a libel in point of law, and then leave it to the jury to say, whether the case falls within that definition. (1 *Saund. R.* 248, *n. ed. of* 1840. 2 *Greenl. Ev.* § 411. *N. Y. Const. Art.* 1, § 8. 1 *R. S.* 94, § 21.) Indeed, Best, J. in *King* v. *Burdett,* substantially admitted this to be the correct practice. (4 *B. & Ald.* 131.) As I understand the charge in this case, it was not a mere opinion, but a direction to the jury that, as matter of law, the letter charged the plaintiff with the commission of a crime. That I think was a question of fact for the jury.

New trial denied.

