## MOORE v. LEVERETT et al.
### No. 12366.

Court of Civil Appeals of Texas. Fort Worth.
Oct. 25, 1930.

Rehearing Denied Nov. 21, 1930.

McDonald & Anderson and B. Y. Cummings, all of Wichita Falls, and W. S. Moore, of Gainesville for appellant.

Adams & Jones and W. O. Davis, all of Gainesville, for appellees.

CONNER, C. J.

This suit was filed on the 6th day of July, 1927, by appellant, W. S. Moore, against W. W. Leverett and A. E. Hermann, charging the publication of a libel. Defendants were duly served, and presented both general and special exceptions to the petition. Leave, however, was granted to amend, and appellant filed his first amended original petition on the 19th day of September, 1929, which, omitting formal parts, reads as follows:

"That on or about the 16th day of July, 1926, the plaintiff W. S. Moore, was the duly qualified and acting judge of the 16th Judicial District of Texas, composed of Denton and Cooke Counties, Texas, and was also at said time a candidate before the Democratic primaries in said District held on the 24th day of July, 1926, for the Democratic nomination for the office of district judge of said district, and that his opponent in said primary election for said nomination was A. C. Owsley of Denton County, Texas; and he further alleges that on all the dates herein mentioned and alleged above and hereinafter alleged, the defendant Leverett and Herman were the owners, publishers, proprietors and editors of a certain newspaper of general circulation in the State of Texas, and particularly in said Cooke and Denton Counties, and published in the City of Gainesville in Cooke County, Texas, known as the Gainesville Signal.

"That heretofore, towit, on or about the 16th day of July, 1926, and prior to said primary election above mentioned, the defendants were the owners and publishers of said newspaper above mentioned, and that prior to said date the plaintiff had been held in esteem and reputed good name, character and reputation by the people of said judicial district and the people of Texas generally, and that he possessed such good name, character and reputation, but that on or about the said date of July 16, 1926, the defendants published in said newspaper under the heading 'The District Judgeship,' an article signed and purporting to be signed by one W. O. Davis, a practicing lawyer at the Gainesville, Texas, bar, which said article so signed and published was maliciously offensive and of and concerning this plaintiff; that among

other statements contained and published in said article, was the following language to-wit:

" 'W. S. Moore seems to think that he ought to be elected by the people because the lawyers are opposed to him. The lawyers are Moore's nearest neighbors and know more about him than anyone else. When did a man have the impudence to claim that he was entitled to an office because his neighbors did not have a good opinion of him? We should mistrust the man who claims to have bad neighbors; the fault is generally with himself. It is no good recommendation to a lawyer that other members of the bar have a poor opinion of him. They are familiar with his methods; they have been consulted by the people who have had dealings with him.'

"That by said language above quoted, it was meant and was intended to mean that plaintiff had been guilty of dishonest and dishonorable conduct and of dishonest, dishonorable and corrupt practices as a lawyer and that he had engaged in criminal conduct toward his clients and their rights in his capacity as an attorney at law.

"Plaintiff further alleges that by said language above quoted it was meant and intended to mean that the plaintiff claimed that his neighbors were bad and that the plaintiffs neighbors had a poor opinion of the plaintiff, and that the plaintiff was impudently claiming that he was entitled to a public office, towit, that of District Judge of the 16th Judicial District, because and on account of the fact that all his neighbors, or his neighbors generally, had a poor or bad opinion of him. '

"Plaintiff further alleges that there was used and published in said article above mentioned the following additional language at said time by the defendants in said newspaper, said article being signed by the said W. O. Davis:

" 'I note that R. R. Bell, our former county attorney and now a resident of Oklahoma City, has rushed into print advocating the election of W. S. Moore. The people remember how R. R. Bell prospered as county attorney. W. S. Moore learned under him.

" 'Nothing more need be said.'

"That by the use of the last above quoted language it was meant and was intended to mean and charge that the said R. R. Bell, who was at one time county attorney of Cooke County, Texas, and while acting as such, had been guilty of dishonorable, dishonest and corrupt conduct as such county attorney and that by such practices he had prospered illegally in a financial way, and that by use of said language it was meant and intended to mean that the plaintiff W. S. Moore had learned corrupt, dishonorable and dishonest practices as a lawyer from

and under the said R. R. Bell, and that the plaintiff had been guilty of dishonesty and of improper conduct in his practice as a lawyer.

"The plaintiff further alleges that the defendants did publish all the above quoted language in said newspaper as above said of and concerning the plaintiff W. S. Moore and that all of the same was false and defamatory and untrue."

It was further alleged that the defendants were acquainted with the plaintiff's good name, character, and reputation, but that "conspiring and maliciously intending to injure the plaintiff and deprive him of his good name, reputation and with the intent to injure his character among the people of said 16th judicial district and of the State of Texas generally who knew him and had confidence in his honesty and integrity, * * * and for the purpose of causing plaintiff injury and damage among those people in said district and the State of Texas generally who did not know the plaintiff did as aforesaid on or about the 16th day of July, 1926, publish and cause to be published and circulated throughout said district and the State of Texas and generally said false, untrue, defamatory and libelous article and statements as aforesaid."

It was further charged, in substance, that on account of and by means of the publication of said false and defamatory words and language, plaintiff had been injured and damaged in his good name and reputation, and that many people throughout the said judicial district and the state of Texas generally, unfamiliar with the facts, were led to believe, as was intended, that the plaintiff had been guilty of dishonest and corrupt practices and of defrauding his clients as a lawyer, and of defrauding other persons, and was generally guilty of improper and fraudulent conduct; that as a result he had been caused to suffer loss and damage in his profession as a lawyer, and had caused him the humiliation of defeat of the office of district judge of said judicial district and of the emoluments of said office; that the language and words quoted were not only false, but that they were willfully and maliciously and knowingly published by the defendants with intent to injure him and deprive him of his good name and reputation and lose the esteem of his friends, neighbors, and acquaintances and the public generally; that the defendants, without investigating the truth of the statements therein, well knew at said time that W. O. Davis was a bitter personal and political enemy of plaintiff, and had been so for many years; that the defendant W. W. Leverett was also a bitter personal enemy of the plaintiff.

It was further alleged that said newspaper had a large circulation in Cooke and Denton counties, and was also circulated and read in many other counties of Texas, as was intend-

ed they should be; that defendants well knew when they published said language concerning plaintiff and R. R. Bell that said Bell had ceased to be county attorney of Cooke county long before the plaintiff ever formed his acquaintance; that plaintiff at no time was connected with Bell when he was county attorney, but later they became law partners.

The prayer was that plaintiff might recover by reason of the premises $20,000 actual damages and $15,000 exemplary damages.

The trial court sustained appellee's general and special demurrers to the petition, and, appellant having declined to further amend, judgment was entered dismissing the suit, and from this judgment an appeal has been duly prosecuted.

Much has been written in the text-books and decisions of other jurisdictions in the effort to maintain the proper equilibrium between the right of free speech and of a free press on the one hand, and due protection of the individual from defamatory words and printing that tends to injure one's reputation and damage him on the other hand. In the disposition of this case, however, we shall content ourselves with references, for the most part, to our own statutory and judicial treatment of the subject.

Article 5430, Rev. Civ. Statutes of 1925, thus defines "libel":

"A libel is a defamation expressed in printing or writing, or by signs and pictures, or drawings tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, or to publish the natural defects of any one and thereby expose such person to public hatred, ridicule, or financial injury."

Article 5432 provides that the publication of certain matters shall be deemed privileged, and shall not be made the basis of any action for libel without proof of actual malice, including the following, to wit:

"A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information."

■ From the wording of the statute, it is evident that the acts of public officials and the qualification and fitness of candidates for office are matters of public concern, and that reasonable and fair comment and even criticism of such official acts or the candidates for public office is permissible as being in the interest of the public.

In 17 Ruling Case Law, p. 304, par. 644, it is said:

"The fact that one is a candidate for office affords in many instances a legal excuse for publishing language concerning him as such candidate, for which there could be no legal excuse if he did not occupy such position."

In 36 Corpus Juris, page 1286, § 292, it is said:

"It has been noticed that there is a distinction between allegations and statements of facts and comment or criticism based or founded on facts. In so far as comment or criticism is concerned, it is generally agreed that when one becomes a candidate for an office his character for honesty and integrity and his qualifications and fitness for the position are put before the public and are thereby made proper subjects for fair comment."

■ It is not contended that the published article complained of is libelous per se, nor do we think, in the absence of adequate innuendos, that it can be said to be libelous at all. We see nothing libelous within itself in the statement that appellant seemed to think that he ought to be elected because the lawyers were opposed to him; nor in the statement that the lawyers were appellant's nearest neighbors and knew more about him than any one else; nor in the imputation that it was impudence to claim office on the ground that his neighbors did not have a good opinion of him. We think we might so proceed with all the other expressions in the published article under consideration, and that, when we consider that there is no denial in the petition of the imputations in the article that appellant in his canvas was criticizing the lawyers for their opposition, we conclude that the article as a whole is not libelous on its face, within the meaning of our statutes and decisions regulating the subject.

■ It is urged, however, that on general demurrer the allegations of the petition must be accepted as true, and it seems to be insisted that the innuendos or inferences drawn by the pleader must be adopted. But we think the rule invoked can have no application to the inferences and conclusions of the pleader drawn from the article. All facts stated, of course, must be accepted as true, but whether the statements of the published article are to be reasonably interpreted as having the meaning attributed to them and as being libelous is for the court. In other words, as said in the case of Enterprise Co. v. Wheat, 290 S. W. 212, by the Beaumont Court of Civil Appeals, writ of error dismissed, the meaning of an article, claimed to be libelous cannot be enlarged or extended by innuendo, so that the innuendo must fail, if the language of the article, taken in the usual meaning, is not reasonably susceptible of the meaning sought to be given it.

In 37 Corpus Juris, p. 24, § 331, it is said:

"The office of the innuendo is to connect the defamatory matter with other facts and

circumstances sufficiently expressed before, for the purpose of showing the meaning and application of the charge. So the innuendo cannot enlarge or restrict the natural meaning of words, introduce new matter, or make certain that which was uncertain, except in so far as it connects the words published with the extrinsic or explanatory circumstances alleged in the inducement or colloquium. The inducement and colloquium must warrant the innuendo. If the publication is not actionable per se, it cannot be made so by an innuendo."

The office of a colloquium is thus stated in 2 Words & Phrases, First Series, pages 1259, 1260:

"The office of the colloquium in a complaint for slander is to allege that the words were spoken with reference to extrinsic facts because of which the words are actionable. Andrews v. Woodmansee (N. Y.) 15 Wend. 232, 235, 236. The 'colloquium' is the name to designate the portion of the plaintiff's pleading, in an action for libel, which is used for the purpose of coupling the words published, which in themselves do not constitute a libel, with facts which show a libelous meaning. Lukehart v. Byerly, 53 Pa. (3 P. F. Smith) 418, 421. As the term is used in reference to the pleadings in libel and slander cases, it is defined as 'an averment that the words in question are spoken of and concerning such usage or report or fact, whatever it is, which gives to the words, otherwise indifferent, the particular defamatory meaning imputed to them.' Carter v. Andrews, 33 Mass. (16 Pick.) 1, 3, 6."

We find no extraneous fact or specific denial stated in the petition to which the language of the published article when applied supports the innuendos, or which enables us to say that the published article under the circumstances was an unreasonable or unfair comment or criticism on a matter of public concern.

We shall not undertake to analyze each sentence of the alleged libelous article; it relating, as it does, to a matter within a privileged class of publications, it is plainly not libelous per se. It follows, therefore, that before we can say that the article is libelous it must be aided or enlarged by appropriate innuendos. This appellant has endeavored to do. In sustaining appellees' special exceptions, the trial court held that the innuendos presented were not sufficiently supported by what is referred to in the decisions as the "colloquium," i. e., averments of extraneous, contemporaneous facts reasonably tending to show that the words of the alleged libelous article had the meaning, and were intended to have the meaning, ascribed to them in the innuendos. We feel unable to say that the court erred in sustaining the exceptions.

Appellant alleges that he was the district judge and seeking election for the ensuing term. He does not deny that his neighboring lawyers were opposing him and that he was endeavoring to use the fact to his advantage. This he could lawfully do, and nothing of a slanderous or defamatory character can properly be inferred therefrom. Much of the rest is but argumentative or critical without the statement of any fact reasonably implying crime or corruption on the part of a man of good repute as appellant alleges himself to be. Neither the character, reputation of Bell, or any practice or act of his is alleged to be the cause or secret of his success so as to authorize an inference that appellant's association with him was corrupting. So the use of the word "bad" and its related words have a very remote implication, if any at all, of corruption on appellant's part.

In other words, the petition is wanting in a statement of explanatory facts or sufficient colloquium to support the innuendos and defamatory inferences alleged. To illustrate what we have in mind, we will refer to the following cases: Snell v. Snow, 13 Metc. 278, 46 Am. Dec. 730, by the Mass. Sup. Court; and Peterson v. Sentman, by the Maryland court, 37 Md. 140, 11 Am. Rep. 534. In the case of Snell v. Snow, it was alleged that the defendant falsely and maliciously said of the plaintiff, " 'she is a bad girl, a very bad girl, and unworthy to be employed by any company in Lowell, meaning thereby that she was a lewd, lascivious, and wanton person, and was guilty of the crimes of fornication, prostitution, lewdness,' etc." In disposing of the case, the court said:

"This court entirely concurs in the opinion of the court of common pleas, that the first five counts are bad. The words set forth in all of them were, 'she is a bad girl,' or 'a very bad girl.' There was no averment of other conversation which took place at the same times, nor any averments of other exterior facts, which, if true, would give a peculiar force and effect to the words used, or show that, though in their natural meaning they did not impute unchaste conduct to the plaintiff, yet, in the connection in which they were used and applied to the plaintiff, they would have that effect. It is true that these words are greatly enlarged and expanded by the innuendoes; but these can not aid the declaration, and make it good. The reasons for this are so fully stated, and the point is so decidedly settled, in the cases of Bloss v. Tobey, 2 Pick. 320, and Carter v. Andrews, 16 Pick. 1, that it seems unnecessary to recapitulate them."

In the case of Peterson v. Sentman, the petition, after alleging that the plaintiff was a feme sole, and a housekeeper, and had always been a virtuous, modest, and chaste citizen, charged that the defendant falsely said: " 'You' (meaning the plaintiff) 'are a bad woman, and keep a bad house, and I can prove it,' meaning thereby to charge that the plaintiff was not a chaste woman, was a whore, and

kept a common bawdy house." The petition was not held to be wholly bad, but as to the term "bad house" it had this to say:

"It is contended by the defendant, that the declaration contains no sufficient colloquium to support and warrant an innuendo, that in saying the plaintiff kept a 'bad house,' the defendant meant thereby to charge, that she 'kept a common bawdy house,' and in this view we concur.

"Charging a person with keeping a 'bad house' is not in itself actionable. The words, however objectionable they may be, admit of other constructions, which readily suggest themselves to the mind, than that given to them by the plaintiff. To say that a person keeps a bad house may mean a disorderly house, or one that is dirty or comfortless. So indefinite is their meaning, that to render them the foundation of an action like the present, the declaration must set out such a statement of circumstances under which they were used, or of the subject matter of the conversation, as will indicate that they were applied in a sense imputing to the plaintiff the wrong complained of. But this, under a rule of pleading firmly established by all the authorities, must be done through a colloquium and not by way of innuendo, the only object of which is to point to and explain what has before been introduced in the declaration. Unsupported by the necessary allegations of a colloquium, the innuendo can never be taken to expand or enlarge the meaning of the words used, and give to them a particular meaning, different from that in which they would be ordinarily understood in their more innocent signification. Words will not be construed to impute a crime, if in their milder sense they have another and more harmless meaning, unless the connection in which they are used and applied would give to them that effect. The office of the colloquium and innuendo, in actions of this description, is very satisfactorily stated in the case of Van Vechten v. Hopkins, 5 Johns. [N. Y.] 211 [4 Am. Dec. 339] (1 Amer. L. C., 117.) In illustrating the proper office of these distinctive parts of a declaration, the Court refer to Barham's Case, 4 Coke's R., 20, and say of it—'Barham brought an action for the defendant's saying of him, "Barham burnt my barn" (innuendo) "a barn with corn." The action was held not to lie; because burning a barn, unless it had corn in it, was not felony.' 'But,' says De Grey, C. J., in Rex v. Horne (2 Cowp., 684) 'if in the introduction it had been averred that the defendant had burnt a barn full of corn, and that in a discourse about that barn the defendant had spoken the words charged in the declaration, an innuendo of its being the barn full of corn would have been good; for by coupling the innuendo in the libel with the introductory averment it would have been complete.' 'Here the extrinsic fact, that the defendant had a barn full of corn, is

the averment. The allegation that the words were uttered in a conversation in reference to that barn is the colloquium, and the explanation given to the words thus spoken is the innuendo.'

"In the case before us, the declaration is wholly silent, in its introductory part, as to the house of the plaintiff. There is an averment that the plaintiff was a housekeeper, but it is no where alleged, by way of colloquium, that the house in which she lived, or its character as kept by her, was the subject of conversation, or the particular object referred to by the defendant, when he used the terms 'bad house' and 'ornary house.' The words 'you keep a bad house' are not actionable, and cannot be made so by an innuendo unless properly introduced by a colloquium. In the case of Snell v. Snow, 13 Metc. [Mass.] 278, [46 Am. Dec. 730], the declaration charged the defendant with falsely and maliciously saying of the plaintiff, 'she is a bad girl, a very bad girl,' innuendo, 'that she was a prostitute and had committed the atrocious crime of fornication.' The declaration was held to be insufficient because it did not contain the necessary averments and colloquium to warrant the innuendo.

A very similar case to the present is that of Dodge v. Lacey, 2 Cart. [2 Ind.] 213, decided by Blackford, J. In that case the declaration charged the defendant, in a conversation concerning the character of the plaintiff for chastity, with falsely and maliciously saying and publishing of her, that she kept 'a public house (meaning a bawdy house).' * * * Authorities upon this point could be cited to a very large number, but it is unnecessary, as they all concur in the inflexible rule, that words that are not actionable ex vi termini cannot be made so by an innuendo, but must be aided by a proper averment and colloquium, which will warrant the explanatory meaning given them by the innuendo.

"The rule may be a strictly technical one, and may operate harshly in its application to this case, but it is too firmly established to be departed from. And under it we hold it to be clear, that there is no sufficient allegation in the declaration before us, requiring the defendant to answer to the charge of having said of the plaintiff that she kept a bawdy house."

The criticisms or imputations presented would naturally provoke a reply on the part of the neighboring and opposing lawyers, one of whom we judicially know was the signer of the article, and we find that in the case of Patterson & Wallace v. Frazer (Tex. Civ. App.) 79 S. W. 1077, it was held that certain words imputing a want of chastity to plaintiff was nonactionable on the ground that the words used had been provoked by plaintiff.

Furthermore, while perhaps not technically available as a reason for our final conclusion,

yet, taking a practical view of the whole case, we deem it not inappropriate to refer to the case of Moore v. Davis, 16 S.W.(2d) 380, by the Amarillo Court of Civil Appeals, and the same case by section A of the Commission of Appeals, reported in 27 S.W.(2d) 153. From these cases it appears that appellant, Moore, had prosecuted W. O. Davis, the signer of the article, of which complaint is made in the case before us, for libel, and that based, upon the identical publication now before us and with innuendos substantially the same, it was held that the judgment of the district court in favor of Davis and against Moore should be affirmed, and that on appeal the commission in a written opinion affirmed the judgment of the Court of Civil Appeals.

It would thus seem that the vital issue of whether the publication in the case before us is actionable has already been finally adjudicated, and that the adjudication may possibly be available to the appellees. See Benavides v. Garcia (Tex. Civ. App.) 283 S. W. 611; same case on writ of error in (Com. App.) 290 S. W. 739; Birdseye v. Rogers (Tex. Civ. App.) 52 S. W. 985, as to which, however, we express no opinion.

On the whole, we conclude that all assignments of error should be overruled and the judgment affirmed.

### On Motion for Rehearing.

The able counsel for appellant presents a very forceful argument in support of the motion for rehearing in this case, which has been read. The argument includes quotations from many authorities that at least seemingly support the principal point made, which is, as we gather from the argument, that, if the published article is susceptible of the meaning attributed thereto in the innuendos, it is libelous, and hence that it was error to sustain the general demurrer. Perhaps the essentials of appellant's contention are more fully and accurately presented in a quotation made from Guisti v. Galveston Tribune, 105 Tex. 497, 150 S. W. 874, 878, 152 S. W. 167, which reads as follows:

"But whatever view may be taken of the language used, if its meaning is ambiguous and of doubtful import, as is conceded by the Court of Civil Appeals, the proper practice is to submit the question to the jury, which was done. Under such circumstances, it was not proper for the court to dispose of the matter by determining what was the reasonable and natural meaning of the statement. That is the court's duty in those cases where the publications admit of no ambiguity, but, where such ambiguity exists in the language complained of, it is the court's duty to define libel and leave to the jury the question as to whether the language is libelous. Cotulla v. Kerr et al., 74 Tex. 89, 11 S. W. 1058, 15 Am. St. Rep. 819."

That case, as well as others cited in behalf of appellant, is, we think, distinguishable from the one now before us, and to now adopt the interpretation placed upon it would be to ignore the rule supported by all the authorities that the words of a publication claimed to be libelous cannot be enlarged by innuendo alone. Where the publication is not libelous per se, as we think is the case here, it is essential that there be allegations of such extraneous circumstances as will enable the court to say that the publication, when read in the light of the circumstances, is reasonably capable of the meaning attributed to it in the innuendos. Such extraneous matter is sometimes designated by the authorities as a matter of "inducement," sometimes as a "colloquium."

In 25 Cyc. p. 437, it is said:

"* * * When the words are not actionable per se, it is necessary to plead in the inducement such extrinsic facts as will render the words actionable, and to connect such extrinsic facts by proper colloquium with the particular words. The want of a proper inducement or colloquium can not be supplied by the innuendo."

Upon the following pages, 438 and 439, it is further said:

"Where matter averred as defamatory requires a resort to extrinsic facts to make it applicable to plaintiff such facts must be averred, unless such averments are rendered unnecessary by provision of statute.

"Where defamatory matter imputing a crime is published in terms prima facie actionable and unequivocally expressive of the essential ingredients of the crime alleged to be charged, no prefatory averment of extraneous facts is required. But where the imputation does not per se import criminality and depends on extrinsic facts to explain it those facts must be set forth, and connected with the defamatory words by a colloquium so as to show that a crime was charged. If the words may be understood in a sense not criminal and there is no colloquium to show they were spoken in a criminal sense, they are not actionable."

The rule is likewise so stated in 37 Corpus Juris, p. 22, § 329. The texts referred to are supported by decisions cited in notes.

There seems to be no serious contention on appellant's part that the published article is libelous per se. If not, as we think must be held, the essential ground of our ruling on original consideration should be adhered to. Appellant's petition, as we construe it, is wanting a sufficient statement of extraneous facts to sustain the innuendos and constitute the publication libelous.

Other reasons mentioned in our original opinion were mere argumentative suggestions that may, or may not, be entitled to weight,

but we conclude. that, for the reasons above stated, the motion for rehearing should be overruled.